UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: ) | |
| ) | Case No. 11 B 700 |
| YOUNG-SOO CHE, ) | |
| ) | |
| Debtor. ) | Chapter 7 |
| ) | |
| _____ ) | |
| ) | |
| DENIELLE KELLY, ) | |
| ) | Adv. No. 11 A 929 |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Judge Pamela S. Hollis |
| YOUNG-SOO CHE, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

This matter comes before the court following trial on Denielle Kelly's complaint seeking to except Young-Soo Che's debt to her from discharge pursuant to 11 U.S.C. § 523(a)(6).[1] For the reasons stated below, judgment will be entered for the Plaintiff, Denielle Kelly.

## FINDINGS OF FACT

Young-Soo Che ("Che") lived at 1038 South Harbor Court in Wheeling, Illinois. Tr. at 9. Denielle Kelly ("Denielle") lived across the hall in 2B, the apartment she shared with her brother Michael. Tr. at 40. The Kelly and Che front doors faced each other, the only two units on the second floor. Tr. at 9-10.

On September 11, 2008, Che was 34 years old, married and expecting a baby. He had a B.S. in industrial management from Carnegie Mellon University and an M.A. in teaching from

---

[1] In her complaint, Denielle also sought denial of discharge in Count II pursuant to 11 U.S.C. § 727(a)(2)(A) and (a)(4)(A). Denielle did not pursue these arguments in her trial brief, and no evidence was submitted at trial in furtherance of these claims. Therefore, the court will consider Count II to have been withdrawn.

National Louis University. Tr. at 50-51. He was working for the Chicago Public Schools as a high school computer technology teacher. Tr. at 52.

That day, Che watched where Denielle and Michael parked their cars. Tr. at 10. Che later told Detective Troy Musolf of the Wheeling Police Department that he "heard the door close and he noticed that vehicles outside belonging to the two residents of his neighbors [sic] were gone." Tr. at 22, lines 12-14. Once Che was sure that Denielle and Michael had left, he entered their apartment. Tr. at 10-11; Tr. at 54.

Che's intention when he entered apartment 2B was to take Denielle's clothing "and items belonging to [her] for his sexual arousal." Tr. at 11; Tr. at 22, lines 15-16. Although Che had been in Denielle's apartment earlier on September 11 and had already taken clothing, Tr. at 16, he wanted more. Tr. at 11. "Sometimes I have sexual urges, and I – I have a fetish or some might call it a sexual addiction. And even though I know it's wrong, I need to fulfill my urges. So I went ahead and went into the apartment." Tr. at 55, lines 5-9.

No medical or other expert testimony was presented regarding Che's urge, fetish or addiction to wearing women's clothing, or to explain why the clothing had to be taken from Denielle's apartment rather than purchased in a store or borrowed from his wife's closet.

Although Che had been sure that Denielle and Michael were gone when he entered their apartment, Michael found Che, wearing Denielle's underwear, leaving 2B after this second visit. Tr. at 10.

Detective Musolf eventually recovered bathing suit tops, bottoms, underwear, a pair of shorts and a tank top, all of which Che took from Denielle's apartment that day and hid behind a picture on the second floor landing. Tr. at 25; Tr. at 29.

Denielle and Michael went into the Wheeling Police Department to make a complaint. After hearing their complaint, Detective Musolf went with Officers Teichen and Truver to the apartment building. Tr. at 20; Tr. at 29. They rang the buzzer, Che opened his door and immediately made a comment to the effect that he couldn't believe he just threw away his life. Tr. at 28.

The Wheeling Police Department arrested Che and took him into custody. Tr. at 12; Tr. at 21. Che signed a consent to search form, and Musolf returned to the apartment building to search Che's apartment. Tr. at 34-35. No more of Denielle's possessions were recovered except for what had already been found on the second floor landing. Tr. at 36.

After signing a Miranda waiver form, Tr. at 32, Che confessed that he had been in Denielle's apartment many times before, although he could not remember the exact number. Indeed, Denielle had noticed from time to time that items were missing, including shoes, bathing suits, underwear, bras, her iPod and a backpack. Tr. at 40-41. "In the course of the two years, the list just kept getting longer. I had a yellow notepad that I kept writing things that were missing. And, I mean, every day." Tr. at 48, lines 4-7.

Denielle first noticed that she was missing shoes in the spring or summer of 2007, and she and Michael discussed it. "I thought, as well as he, I was going crazy because I was, like, the box is there, the shoes are gone." Tr. at 41, lines 21-23. She was quite sure that at least two pairs of shoes had disappeared because "the boxes, they're homes. I'm big on homes. Everything has a home. And the home was there, and those shoes were not." Tr. at 46, line 25 – page 47, line 2.

Che testified at trial that his best guess was that he had entered Denielle and Michael's apartment ten times, but that he felt coerced by the police into confessing that he had been in the

3

apartment twenty to forty times. Tr. at 13-14. Each time Che entered Denielle and Michael's apartment, it was through the unlocked front door. Tr. at 56. He knew what would happen if he were caught. Tr. at 57.

Whether Che was in Denielle's apartment ten times or forty times, each time he went into her apartment, he did so with the intent to take "various items such as clothing, undergarments and shoes." Tr. at 15, lines 11-12. He stole all of these types of items from Denielle, disposing of them later in a Goodwill bin. Tr. at 15.

Che told Detective Musolf that the "purpose was to obtain usually clothing and items that belonged to her [Denielle] in order to be sexually aroused . . ." Tr. at 24, lines 12-14.

Denielle believed that none of the clothing was ever returned to her except for what was recovered on September 11, Tr. at 42, although Che testified that on some occasions he did return items, Tr. at 58.

> Some items I attempted to put back where I first found them, and some items I felt that it was too risky to go back. And I didn't want to get caught, so I either threw them away or threw them – put them in the Goodwill receptacle.

Tr. at 58, lines 11-15. Che understood that when he gave these items to Goodwill, Denielle would necessarily be deprived of their use, Tr. at 15-16.

Che also took an iPod from Denielle's apartment. Tr. at 16. "I don't remember the reason why I took it, but that was one item that had nothing do [sic] with the sexual arousal." Tr. at 57, lines 4-6. Che's wife found the iPod in their apartment, so he gave it to her as a gift. "She found it, so I had to make up a reason." Tr. at 16; Tr. at 57, lines 11-12.

Denielle eventually recovered the iPod after officers of the Winnetka Police Department retrieved it from Che's wife, a special education teacher at New Trier High School. Tr. at 17; Tr. at 26; Tr. at 52. Denielle noticed when the iPod was returned to her that the serial number had been scratched out. Tr. at 43.

4

Denielle testified that after his arrest, Che tried to buy her silence:

Q: To your knowledge, my client [Che] apologized to your brother about what happened on September 11th?

A: To my knowledge, he had offered my brother money in order to not discuss the situation any further.

Q: Well, was it that he would have paid for the clothing or did he offer money in terms of a bribe? Is that your understanding?

A: To my understanding, it was more a bribe.

Tr. at 48, lines 16-24.

Che was eventually charged with the crime of residential burglary. Tr. at 38. He pled guilty to burglary and was sentenced to two years of probation with mandatory counseling. Tr. at 54. He successfully completed the probation and counseling. Id. No evidence was adduced at trial regarding the nature of the counseling, nor was testimony taken from anyone other than Che regarding the counseling. Che's testimony on the subject consisted of one statement noting that mandatory counseling was part of his sentence.

Denielle filed a civil suit against Che, but he filed his petition for relief under Chapter 7 before the civil suit went to trial. Tr. at 17. Che is no longer working for the Chicago Public Schools. Tr. at 53.

Prior to September 11, 2008, the Ches made several complaints to the building association's director about the Kellys, and violation notices were issued. Tr. at 44. The director eventually held a meeting with both parties, most of the fines were waived and the violation notices stopped. Tr. at 45.

## CONCLUSIONS OF LAW

**Standard of Law Under 11 U.S.C. § 523(a)(6)**

In her complaint, Denielle seeks a finding that the debt Che owes to her is nondischargeable pursuant to 11 U.S.C. § 523(a)(6):[2]

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt –
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

Denielle must prove her case by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279 (1991). Exceptions to discharge are narrowly construed in favor of the debtor. In re Chambers, 348 F. 3rd 650, 654 (7th Cir. 2003) (citation omitted).

In order to prevail on her complaint, Denielle must prove by a preponderance of the evidence that: (1) Che caused an injury; (2) his actions were willful; and (3) his actions were malicious. See In re Cole, 378 B.R. 215, 226 (Bankr. N.D. Ill. 2007) (citation omitted). The Supreme Court has clarified the meaning of § 523(a)(6), stating that "only acts done with the actual intent to cause injury" come within its scope. Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998). In order to be willful and malicious, the injury must be intentional, "not merely a deliberate or intentional act that leads to injury." Id. (emphasis in original).

The Seventh Circuit recently recognized that the phrase "willful and malicious" has generated a "pseudo-conflict among circuits . . . different legal definitions of the same statutory language that probably don't generate different outcomes." Jendusa-Nicolai v. Larsen, 677 F. 3rd 320, 322-23 (7th Cir. 2012).

---

[2] In her trial brief, Denielle argued that Che's bankruptcy case was not filed in good faith. This argument would be a basis for seeking dismissal of the bankruptcy case pursuant to 11 U.S.C. § 707, except that such relief is sought by motion during the pendency of a bankruptcy case. Che's bankruptcy case has been fully administered and is closed, therefore this argument has not been considered by the court.

After reviewing the definitions proffered by various courts, the <u>Jendusa-Nicolai</u> panel concluded that:

> whatever the semantic confusion, we imagine that all courts would agree that a willful and malicious injury, precluding discharge in bankruptcy of the debt created by the injury, is one that **the injurer inflicted knowing he had no legal justification and either desiring to inflict the injury or knowing it was highly likely to result from his act**. To allow him to shirk liability by discharging his judgment debt in those circumstances would undermine the deterrent efficacy of tort law without serving any policy that might be thought to inform bankruptcy law.

<u>Id.</u> at 324 (emphasis added).

### Che Caused an Injury

Che admits in his trial brief that the "injury" is Denielle's loss of the use and enjoyment of her property. Docket No. 51 at 2.

### Che Inflicted the Injury Knowing That He Had No Legal Justification and Knowing That the Injury Was Highly Likely to Result, Thus the Debt is For a Willful and Malicious Injury

Having established that an injury occurred, the remaining question is whether the injury was willful and malicious – that is, whether Che injured Denielle knowing that he had no legal justification to do so and either desiring to inflict the injury or knowing that the injury was highly likely to result.

Che admitted in his trial brief that "[t]here is no dispute that [he] intended to take the clothing items that belonged to [Denielle] Kelly." Docket No. 51 at 5. The evidence adduced at trial established that Che deliberately waited until he was sure that Denielle and her brother had left the building. Only then did he enter their apartment, without permission, to take items that did not belong to him and to which he had no right. Indeed, he pled guilty to a charge of burglary, an element of which is, without authority, knowingly entering or remaining within a building. 720 ILCS 5/19-1(a) (West 2013). When confronted by the police, Che made a

comment to the effect that he couldn't believe he just threw away his life, further support for the conclusion that Che knew what he had done was legally wrong. Denielle has proved by a preponderance of the evidence that Che acted knowing that he had no legal justification to do so.

The final issue is whether Che knew that the injury – Denielle's loss of the use and enjoyment of her property – was highly likely to result. Che argues that he did not intend the consequences of his actions to be the loss of Denielle's possessions. Instead, he contends that he took her clothing thinking not of the fact that Denielle would be deprived of its use, but of the sexual pleasure that that clothing would give him. "And even though I know it's wrong, I need to fulfill my urges." Che argues that the resulting injury to Denielle was merely an unintended consequence, and should not result in a finding that his debt to Denielle is nondischargeable.[3]

This is one of the more creative arguments put forth in this court. Nevertheless, it must fail. The Seventh Circuit tells us that an act is willful and malicious if the debtor knew the injury was highly likely to result. Che may not have thought through all the consequences of his actions, but the court has no doubt that this well-educated man with a master's degree in teaching knew that the moment he tossed Denielle's clothing in the Goodwill bin, it was highly likely that she would never see that clothing again.

Moreover, the only evidence presented to the court regarding Che's sexual fetish or urges was his own self-serving testimony. No expert testified on this issue, and although a brief reference was made to mandatory post-conviction counseling, the court has no evidence that this counseling addressed a need to dress in women's clothing rather than a need to steal someone else's possessions.

---

[3] In his post-trial brief, Che's lawyer writes that "the unintended consequence of Che's action should not deny him a discharge under Section 523(a)(6)." Docket No. 51 at 5. Indeed, these actions will not deprive Che of a discharge of all other debts. Che received a Chapter 7 discharge. The purpose of this adversary proceeding is only to determine whether the particular debt owed to Denielle Kelly will be excepted from that general discharge.

8

Suppose Che had filled out a personal financial statement in order to obtain a car loan, and he provided false information by overstating his income. If the lender brought a § 523(a)(2)(B) action, could Che escape a finding of nondischargeability by testifying that he lied about his income not with the intent to deceive the lender but only to satisfy his urge for a new car? Any harm to the lender was unintentional, subsumed by his intent to procure a new car. Is the court's inquiry over?

It is not. Debtors will rarely provide direct testimony of their fraudulent intent. Indeed, it is more common that "malicious intent [will] be demonstrated by evidence that the debtor had knowledge of the creditor's rights and that, with that knowledge, proceeded to take action in violation of those rights." Jenkins v. IBD, Inc., ___ B.R. ___, 2013 WL 1497887, *7 (D. Kan. April 11, 2013) (quotation omitted).[4] In this case, Che may have had sexual urges that he needed to satisfy by wearing women's clothing. That fact does not preclude a finding that Che also intended to permanently deprive Denielle of her clothing.

Indeed, permanently depriving Denielle of her clothing would provide the gratification he sought. Che acted intentionally when he took Denielle's clothing, with no legal justification for doing so. He knew that taking the clothing and then later tossing it out either in the garbage or Goodwill bin was highly likely to cause injury to Denielle. The court may therefore infer the ultimate fact of intent to cause injury, see Nat'l Labor Relations Board v. Gordon, 303 B.R. 645, 656 n.2 (Bankr. D. Colo. 2003), regardless of whatever other motivations may have also been at work.

---

[4] For this proposition, Jenkins quotes In re Posta, 866 F. 2nd 364 (10th Cir. 1989). Posta was overruled in part by Kawaahau v. Geiger, 523 U.S. 57 (1998), as to its holding that "willful" requires only an intentional or deliberate act. It is still good law for the point at issue here. "Geiger does not address the evidence by which intent to injure can be established. We believe that as to proof of intent to injure in the context of conversion of secured property, Posta and Pasek remain instructive. Intent may be established by either direct or indirect evidence." In re Longley, 235 B.R. 651, 657 (B.A.P. 10th Cir. 1999).

Che argues that his testimony that some of the clothing was returned supports the inference that he did not intend to permanently deprive Denielle of the use of her property. The court rejects this argument. First, Denielle testified that none of the clothing was ever returned. Second, Che admitted that it was usually too risky to do so. Finally, if Che did return some of the clothing, he did so only when the risk of being caught was low. Thus, the decision to permanently deprive Denielle of the use of her clothing had nothing to do with Che's sexual urges and everything to do with the likelihood that he would be discovered.

Several cases have held that even where the debtor was advancing his prurient interests rather than intending harm, the resulting injury was intended. The court agrees with Che's argument in his trial brief that these opinions are not on all fours, since in each case specific or inferred intent was an element of the underlying tort, which it is not in this proceeding. "Intent to harm" is not an element of burglary, the crime to which Che pled guilty.

But under the most recent Seventh Circuit authority, the key question is <u>whether Che knew that the injury was highly likely to result</u>. To this question, after having heard the testimony of the witnesses and considered the evidence, the court must answer yes. Even if Che was motivated to enter Denielle's apartment and take her possessions in the hope of satisfying a sexual fetish, he knew that once he took the items it was highly likely that Denielle would be permanently deprived of their use. He knew that it was risky to enter Denielle's apartment and return the items, so with the exception of the iPod gifted to his wife, he dumped them in the garbage or in a Goodwill bin. Each time he made the decision to toss out Denielle's possessions, he knew they were lost to her. It is possible that some of the items were returned as Che claims – Denielle's testimony that nothing was returned can be reconciled with this version of events if Che returned the items <u>before</u> she knew they were missing. But Denielle gave very credible

10

testimony about the discussions she had with her brother, the list she kept of missing items, and the methods she used to organize her possessions. When Denielle noticed an item was missing, it was not returned. In light of the risks he ran each time he entered the apartment Che knew that it was highly likely that most of the items he took would never be returned.

It is even clearer that Che stole Denielle's iPod knowing that he had no legal justification to do so and that the injury of permanently depriving her of her property was highly likely to result. Che admitted that taking the iPod had no relation to his sexual fetish. "I don't remember the reason why I took it, but that was one item that had nothing do [sic] with the sexual arousal." It was available, so he took it.

Moreover, when Che's wife discovered the iPod in their apartment, it became a surprise gift for her, removing any possibility that the iPod would be returned. Che took the iPod knowing he had no legal justification to do so and that Denielle would be deprived of its use, again clearly satisfying the Seventh Circuit's criteria for a willful and malicious injury. Indeed, the iPod was not recovered until the Wheeling Police Department notified the Winnetka Police Department that the iPod was in their jurisdiction. Only after officers from the Winnetka Police Department visited Che's wife at her place of employment and seized it was the iPod returned to Denielle.

Even construing the exception to discharge narrowly, the court concludes that Che knew that the permanent loss of Denielle's clothing and other items – especially her iPod – was highly likely to be the result of watching until she and her brother drove away, sneaking into her apartment and stealing whatever possessions suited him.

**The Court Will Not Enter a Money Judgment**

Subject matter jurisdiction to decide a dischargeability dispute lies unquestionably with this court. Whether this court has subject matter jurisdiction to liquidate a nondischargeable claim and enter a final money judgment, however, is a question that splits the Circuits. See In re Cambio, 353 B.R. 30, 33–34 (B.A.P. 1st Cir. 2004) ("[T]he only effect of the money judgment against this [no-asset] debtor would be to enhance Mattera's future ability to collect the debt from Cambio's post-bankruptcy income and assets, with no effect at all on property of the bankruptcy estate or creditors' claims against the estate"). Compare Cowen v. Kennedy, 108 F. 3rd 1015 (9th Cir. 1997).

In our Circuit, the Matter of Hallahan panel wrote that "we think it preferable to allow bankruptcy courts ruling on the dischargeability of a debt to adjudicate the issues of liability and damages also." 936 F. 2nd 1496, 1508 (7th Cir. 1991) (citations omitted). This "accords with the rule generally followed by courts of equity that having jurisdiction of the parties to controversies brought before them, they will decide all matters in dispute and decree complete relief." Id. (quotation omitted).

Although Hallahan tells us that bankruptcy courts may enter a money judgment in dischargeability suits, it was written long before the Supreme Court issued Stern v. Marshall, ___ U.S. ___, 131 S. Ct. 2594, 180 L. Ed. 2nd 475 (2011). Pursuant to Stern, even "where subject-matter jurisdiction indisputably exists, [we must ask] whether the bankruptcy court possesses the constitutional authority to enter final judgment." Nate Hull and Nicholas M. McGrath, "Liquidating Nondischargeable Claims after Stern v. Marshall," 31 Am. Bankr. Inst. J. 38 (November 2012).

> While the court's language in Hallahan certainly was a reasonable statement in 1935 and 1991, recent Supreme Court treatment of this subject has cast a much

12

dimmer light on the power of non-Article III courts to render money judgments in dischargeability litigation.

In re Antonelli, 2011 WL 5509494, *1 (Bankr. D.R.I. Nov. 10, 2011) (footnote omitted). The Antonelli court followed the relevant precedent in its Circuit (Cambio ) in determining that it did not have the power to issue a writ of execution in a dispute where the outcome would have no effect on the bankruptcy estate.

While this court is bound by the Seventh Circuit's holding in Hallahan, that decision does not compel entry of a money judgment by the bankruptcy court—it only acknowledges that subject matter jurisdiction to do so exists. And although at least one of the bankruptcy judges in this district determined that "the authority to enter a final dollar judgment as part of the adjudication of nondischargeability, as recognized in Hallahan, was not impaired by Stern," In re Boricich, 464 B.R. 335, 337 (Bankr. N.D. Ill. 2011) (Schmetterer, J.), this court finds it more appropriate to refrain from entry of a money judgment and to restrict its final judgment in this proceeding to a finding of nondischargeability. Since the underlying bankruptcy is a no asset case, the amount of any money judgment would have no effect on the estate or on a distribution to creditors. See also In re Deitz, 469 B.R. 11 (B.A.P. 9th Cir. 2012) (Markell, J., concurring) (raising multiple concerns about the subject matter jurisdiction and constitutional power of a bankruptcy court to enter an enforceable money judgment, but acknowledging that binding precedent in the Ninth Circuit can only be reconsidered by the Circuit itself).

Moreover, Hallahan reasoned that bankruptcy courts may rely on their genesis as courts of equity when deciding questions of law. Subsequently, however, a recent Seventh Circuit panel discouraged such reliance. Sunbeam Products, Inc. v. Chicago American Mfg., LLC, 686 F. 3rd 372, 375–76 (7th Cir.) ("There are hundreds of bankruptcy judges, who have many different ideas about what is equitable in any given situation.... Rights depend, however, on what the Code

provides rather than on notions of equity."), cert. denied, ___ U.S. ___, 133 S. Ct. 790, 184 L. Ed. 2nd 596 (2012). In light of the constitutional questions that might arise, the court will not enter a money judgment in a fixed amount. Instead, the court finds that the debt owed by Che to Denielle, in whatever amount may be determined in another forum, is a nondischargeable debt. See Rutkowski v. Adas, 488 B.R. 358, 379-80 (Bankr. N.D. Ill. 2013).

## CONCLUSION

For all of the reasons stated above, the court finds that Denielle proved by a preponderance of the evidence that (1) Che caused an injury; (2) his actions were willful; and (3) his actions were malicious. Che's debt to Denielle arising from the facts found herein, whatever the value of that debt may be, is excepted from Che's discharge. Judgment will be entered for the Plaintiff, Denielle Kelly.

Date: MAY 15 2013

PAMELA S. HOLLIS
United States Bankruptcy Judge